Nancy Marlene **ADKISON**; George W. Adkison, Appellants,

v.

**G.D. SEARLE & CO.,** a Delaware corporation; Searle Laboratories, a Division of Searle Pharmaceuticals, Inc.; Searle & Company; John Doe, I; John Doe, II; John Doe, III; John Doe, IV; John Doe, V, Appellees.

No. 91–2993.

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1992.

Decided July 27, 1992.

---

David Hodges, Little Rock, Ark., argued, for appellants.

Elizabeth Robben Little Rock, Ark., argued (Richard Josephson and Gail Brownfield of Houston, Tex., on the brief), for appellees.

Before FAGG, Circuit Judge, HENLEY, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

HENLEY, Senior Circuit Judge.

Nancy and George Adkison brought this products liability suit alleging the intrauterine device (IUD) manufactured by the defendants, collectively referred to as "Searle," harmed Nancy Adkison and rendered her infertile. The district court[1] entered summary judgment in favor of Searle and the Adkisons appeal. We affirm.

## I.

In May 1982 Ms. Adkison consulted with Dr. Allen McKnight about using an IUD as a means of birth control. After performing a pelvic examination and discussing the IUD, Dr. McKnight inserted without incident an IUD manufactured by Searle known as the "CU–7." At that time, Ms. Adkison received and read the "physician's insert" that accompanied the CU–7. This document contains descriptions and warnings of adverse reactions and contraindications, including the risk of infection and infertility, which may be associated with the use of the CU–7.

Sometime in 1984, Ms. Adkison experienced some unusual pelvic bleeding. She spoke to Dr. McKnight's office by telephone and he indicated that the IUD should be removed. When Ms. Adkison arrived to see Dr. McKnight, he was out of the office. She saw Dr. McKnight's partner, Dr. Phillips instead. Dr. Phillips examined Ms. Adkison and recommended that she take birth control pills for a month to see if that would stop the bleeding. The IUD was not removed and the birth control pills were immediately effective in stopping the bleeding.

In May 1985, Dr. McKnight removed the first CU–7 and inserted another. This procedure is routine; Dr. McKnight recommended that the CU–7 be replaced every three years. A pap smear performed at this time showed signs of abnormal cells on Ms. Adkison's cervix. After this diagnosis, Ms. Adkison re-read the "physician's insert" and read for the first time the "Searle patient booklet." She was sched-

---

1. The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

uled to receive a cold cone biopsy in July 1985 and she requested that the second IUD be removed during the procedure. The biopsy revealed the presence of condylomatous cervicitis, a sexually transmitted viral disease known as venereal warts. Ms. Adkison testified in her deposition that she believed the CU–7 caused her pap smear to be abnormal.

Two years later, in July 1987, Ms. Adkison experienced an ectopic pregnancy in her right fallopian tube. Her physician, Dr. Jerry Robertson, concluded the ectopic pregnancy was caused by an infection known as pelvic inflammatory disease (PID) in her fallopian tubes. Her right fallopian tube was removed and her left tube is severely scarred. As a result, she is now infertile.

In February 1990 the Adkisons sued Searle claiming the CU–7 caused Ms. Adkison's injuries. The district court granted Searle's motion for summary judgment on two independent grounds: first, Ms. Adkison was aware of her injury in 1985 and therefore her cause of action was time-barred under the Arkansas statute of limitations; and second, there was no evidence that Ms. Adkison's injuries were caused by the CU–7. We affirm the district court's grant of summary judgment because the Adkisons failed to commence this action within the three-year limitations period.

## II.

■ In reviewing a grant of summary judgment, we apply the same standard as the district court, view the evidence in the light most favorable to the nonmoving party, and give the nonmoving party the benefit of all reasonable inferences to be drawn from the evidence. *Moore v. Webster*, 932 F.2d 1229, 1230–31 (8th Cir.1991). We must determine whether "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

This is a diversity case under 28 U.S.C. § 1332 (1988) in which the Adkisons allege Searle is negligent and strictly liable in tort under Arkansas law. The Arkansas statute of limitations states, "All product liabil-

ity actions shall be commenced within three (3) years after the date on which the death, injury, or damage complained of occurs." Ark.Code Ann. § 16–116–103 (1987). The issue presented in this appeal is whether, based on the record before us, the statute of limitations began to run as a matter of law before February 23, 1987, three years before the Adkisons filed this lawsuit.

This court has recognized that "[w]hen the [Arkansas] three-year period of limitations starts is a complicated question." *Mulligan v. Lederle Lab.*, 786 F.2d 859, 863 (8th Cir.1986). In *Mulligan*, we examined the language of the statute, the most recent Arkansas Supreme Court decision interpreting the statute, *Spickes v. Medtronic, Inc.*, 275 Ark. 421, 631 S.W.2d 5 (1982), and the district court's opinion in *Schenebeck v. Sterling Drug*, 291 F.Supp. 368 (E.D.Ark.1968), *aff'd*, 423 F.2d 919 (8th Cir.1970). We note that the Arkansas Supreme Court has not squarely dealt with this issue since *Spickes* and therefore the principles set forth in *Mulligan* apply to the case before us. We also note that we have applied these principles in *Brown v. Dow Chem. Co.*, 875 F.2d 197 (8th Cir. 1989).

■ In *Mulligan*, we restated the standard set forth in *Schenebeck* as follows:

[T]he moment of accrual should be established by reference to a plaintiff's awareness of his or her condition, including both the fact of the injury and the probable causal connection between the injury and the product's use; in essence, the court or jury must determine the time at which an individual would have sufficient knowledge and understanding of an alleged injury to initiate a lawsuit.

786 F.2d at 864. In the present case, the difficult inquiry is determining the degree or level of manifestation of the plaintiff's injury that will start the limitations period. We must bear in mind that it is not necessary for the "full extent of the injury" to be manifested for the period to start running. *See Mulligan*, 786 F.2d at 863; *Spickes*, 275 Ark. at 423, 631 S.W.2d at 6–7.

■ We now turn to the facts before us. Ms. Adkison twice stated in her deposition that she became aware of a causal connection between her injury and the use of the CU–7 in July 1985, five years before filing suit. Her deposition reads as follows:

Q: When you read the book, did it—after you read the book, did you form a belief that your Class III pap smear results and your condition—your condition at that time—were related to your use of the CU–7?

A: Yes, I thought it was.

\* \* \* \* \* \*

Q: And you still hold the belief today that the condition giving rise to the Class III pap smears and your biopsy are related to your earlier use of the CU–7?

A: I believe my problem started in 19— when I had spotted for about a month. I think that was in—

Q: July of 1984?

A: Yes.

Q: And you believed that in the summer of 1985?

A: I believed that when my pap smear came back wrong.

Q: And that was June of 1985?

A: July '85 was when I had the biopsy on my cervix.

Ms. Adkison contends her deposition merely shows that in 1985 she believed the CU–7 caused the Class III pap smear. She argues the testimony does not indicate she believed in 1985 that the CU–7 did or could cause PID which could lead to infertility.[2] She claims she did not know what was wrong with her in 1985. Her pap smear came back "wrong" and she was scheduled to have a biopsy of her cervix. She instructed the physician to remove the IUD. Her biopsy revealed she did not have cancer and she was told the irregular pap smear was likely caused by a type of viral wart-like growths. She claims she was not told that these growths were caused by a contagious venereal disease. She was not diagnosed as having PID and no doctor discussed with her the possibility that the IUD caused the injury. Ms. Adkison claims it was not until July 1987, when she became pregnant and had to have her fallopian tube removed, that she became aware of that nature of her injury. In essence, Ms. Adkison argues a genuine issue of material fact exists concerning what she knew in 1985.

Under the principles discussed in *Mulligan,* we must determine whether the manifestation of harm in 1985 was of such a level that the limitations period began to run as a matter of law. In other words, we must decide whether Ms. Adkison was or should have been aware of both the fact of her injury and the probable causal connection between the injury and the CU–7. We find that Ms. Adkison did have sufficient knowledge in 1985 of her injury and its cause.

The Adkisons apparently attempt to separate the injury into two distinct injuries, both of which they believe were caused by the CU–7. First, they identify the irregular pap smear and venereal warts discovered in 1985. Second, they identify a PID, discovered in 1987, which led to Ms. Adkison's infertility. The Adkisons argue they are not suing Searle for damages related to the first injury, but only for damages related to the second. Their complaint indicates this to be the case; the Adkisons alleged that *after* the CU–7 was removed in 1985, Ms. Adkison suffered a severe PID which led to infertility.

We are not persuaded this type of injury is separable. We recently dealt with his issue in a very similar case. In *Klempka v. G.D. Searle & Co.,* 963 F.2d 168 (8th Cir.1992), the plaintiff was diagnosed in 1977 as having chronic PID which was caused by a CU–7. In 1982, Ms. Klempka was informed that she was infertile and that the CU–7 may have caused her infertil-

2. In fact, Ms. Adkison later filed an affidavit denying that she formed this belief in July 1985, and stated that she was "not aware of the relationship between the CU–7 and the pelvic infection, blockage of fallopian tubes and the inability to become pregnant until 1987." We do not address Searle's argument that this self-serving affidavit cannot create a material issue of fact. Instead, we treat it as a clarification of Ms. Adkison's deposition testimony.

ity. Ms. Klempka then filed suit in 1986. In holding that Ms. Klempka's suit was untimely under Minnesota's six-year statute of limitations, we stated that "her infertility is not a separate and distinct injury that would start the statute of limitations to run in 1982, but instead, is a consequential damage resulting from the PID [diagnosed in 1977]." At 171.

Ms. Adkison believed in 1985 that the CU–7 was the cause of an abnormal pap smear and she requested that the CU–7 be removed when she had a biopsy. Although Ms. Adkison was never diagnosed as having PID, as was Ms. Klempka, Ms. Adkison thought the CU–7 had caused some sort of viral infection (venereal warts) in her pelvic region. We have held that a doctor's diagnosis of a causal connection is not necessary for the limitations period to start running. *Brown v. Dow Chem. Co.*, 875 F.2d 197, 200 (8th Cir.1989). Perhaps the key to our holding today is our statement in *Mulligan* that "the limitations period can begin running if the manifested damage, even if slight, reveals the *nature* of the injury." 786 F.2d at 864 (emphasis added). Although the actual harm to Ms. Adkison in 1985 may have been slight, the diagnosis that she had a pelvic viral infection sufficiently revealed the nature of her injury. Therefore, we find that the manifestation of harm in 1985, together with Ms. Adkison's belief that the CU–7 was responsible for her injury, was sufficient to start the limitations period running as a matter of law.

### III.

We affirm the district court's order granting summary judgment in favor of Searle.