Richard CHRISTIANSON, Plaintiff,

v.

POLY–AMERICA, INC. MEDICAL
BENEFIT PLAN, Defendant.

No. Civ.02–1384(RHK/AJB).

United States District Court,
D. Minnesota.

Oct. 21, 2003.

Mark M. Nolan and Jodell M. Galman,
Nolan, MacGregor, Thompson & Leighton,
St. Paul, Minnesota, for Plaintiff.

Jeffrey E. Grell, Ricoact.com LLC, Edi-
na, Minnesota, for Defendant.

## MEMORANDUM OPINION
## AND ORDER

KYLE, District Judge.

### Introduction

This matter comes before the Court on
cross-motions for summary judgment.

Plaintiff Richard Christianson has sued Defendant Poly–America, Inc. Medical Benefits Plan ("Poly–America") alleging that Poly–America violated its fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, by denying his claim for medical expenses incurred during a hospitalization for deep vein thrombosis. Both sides agree that there are no disputes of material fact and that judgment is appropriate as a matter of law. For the reasons set forth below, the Court will grant Christianson's motion and deny Poly–America's motion.

### Background

On January 18, 2001, Christianson visited his doctor, Dr. Robyn Oliver, after experiencing painful swelling in his left leg. (Nolan Aff. Ex. 6 (Letter of Dr. Oliver), Ex. 2 (United Hospital Intake Form) at 1.) Dr. Oliver sent Christianson to Regina Hospital, where an ultrasound revealed deep vein thrombosis of the lower leg. (Nolan Aff. Ex. 2 (Intake Form) at 1.) Deep vein thrombosis is a blood clot in a vein that generally occurs where the blood stops or slows down, such as the calves of the legs. (*See* WebMD Health, "Deep Vein Thrombosis," *available at* http://my.webmd.com/ content/healthwise /139/34730); *see also* Fed.R.Evid. 201(b). The major risk associated with deep vein thrombosis is that the blood clot will break lose and travel though the bloodstream to the lungs. (*Id.*) Treatment varies from anticoagulant medication to the insertion of a vena cava filter to prevent blood clots from traveling through the bloodstream. (*Id.*) Smoking is a risk factor for deep vein thrombosis. (Grell Aff. Ex. 6 (Christianson Letter).)

Christianson was promptly admitted to United Hospital. (Nolan Aff. Ex. 2 at 1.) Dr. Georgia Taggart, the admitting physician, noted on the intake form that Christianson's work "involves standing on a hard concrete floor for 50 plus hours a week. He has to stand for long periods of time, with very little walking.... Other than that, he has no real risk factors for deep venous thrombosis." (*Id.*) Dr. Taggart noted that Christianson's habits included smoking and developed a two-part "Assessment and Plan":

1. Deep venous thrombosis. This is a healthy, 46–year–old man with a new deep venous thrombosis. He has minimal risk factors for deep venous thrombosis, other than prolonged standing and tobacco abuse. I think he needs investigation for the factor V Leiden mutation.... [1]

2. Tobacco abuse. Smoking cessation counseling offered.

(*Id.*)

Christianson was admitted to a hospital bed, where he underwent a left leg thrombolysis and six days of lytic therapy designed to break-up the blood clot and restore normal blood flow. (*Id.* Ex. 3 (Discharge Report) at 1.) Dr. Charles Terzian noted that Christianson "had no risk factors for deep venous thrombosis." (*Id.*) Upon discharge, he instructed Christianson to "refrain from smoking" and reiterated a primary diagnosis of "[d]eep venous thrombosis of [the] lower left extremity" and a "[s]econdary diagnosis [of] tobacco dependency." (*Id.*)

Christianson submitted medical bills totaling approximately fifty thousand dollars to his insurer, the Poly–America Medical Benefit Plan. Under the plan, "[c]harges

---

1. The factor V Leiden mutation is the most common genetic cause of deep vein thrombosis and is involved in approximately twenty to forty percent of all cases. *See* "Venous Thrombosis and the Factor V (Leiden) Mutation," 14 *Molecular Genetic Testing in Mainstream Medicine* (1997); *see also* Fed.R.Evid. 201(b). The factor V Leiden mutation is found in approximately three percent of the general population. (*Id.*)

related in any way, shape or form to, or complicated by, the use of tobacco products or for treatment of an ailment or condition associated with the use of tobacco" are excluded from coverage. (Grell Aff. Ex. 1 (Poly–America Medical Plan) at 18.) On June 1, 2001, the plan administrator sent Christianson a letter stating that Poly–America had determined that his medical expenses were related to smoking and denied his claim under the plan. (Nolan Aff. Ex. 1 (First Denial Letter).) On June 30, 2001, Christianson requested a review of that decision. (*Id.* Ex. 4 (Second Denial Letter).) Upon consultation with Dr. Jerry Gurkoff, an osteopath and orthopedic surgeon, the plan administrator confirmed his original decision. (*Id.*)

On September 20, 2001, Dr. Oliver sent a letter to Poly–America stating her belief that Christianson's deep vein thrombosis was "idiopathic," or of an unknown cause or origin. (*Id.* Ex. 6 (Oliver Letter).) Likewise, Dr. Terzian submitted a letter stating that there was "nothing in Dr. Taggart's and my dictation to support [the] claim" that Christianson's "deep venous thrombosis was related to tobacco abuse." (*Id.* Ex. 7 (Terzian Letter).) This suit followed.[2]

### Standard of Decision

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P.

56(c). It is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court views the evidence, as well as all reasonable inferences, in a light most favorable to the nonmoving party. *See Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996); *see Adkison v. G.D. Searle & Co.,* 971 F.2d 132, 134 (8th Cir.1992). The moving party carries the burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.,* 224 F.3d 735, 738 (8th Cir.2000). The nonmoving party may not rest upon the allegations or denials of its pleadings. Rather, the nonmovant must establish the existence of specific facts that create a genuine issue for trial. Neither mere allegations nor denials are sufficient. *See Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. 2505.

On summary judgment, the court does not weigh facts or determine the credibility of affidavits and other evidence. *See id.* at 249, 106 S.Ct. 2505. The nonmovant cannot, however, avoid summary judgment by highlighting some alleged factual dispute between the parties. Instead, the disputed fact must be "outcome determinative under prevailing law"; it must be material to an essential element of the

---

**2.** The exact timing of the medical opinions discussed above poses a problem with which neither party has chosen to grapple. For instance, Dr. Gurkoff's medical opinion is dated one month *after* the plan administrator sent a letter purportedly relying upon it. Likewise, the opinions of Drs. Oliver and Terzian were also sent *after* the plan administrator's letter confirming the denial of benefits. The plan's denial-of-claim procedures, however, do not place an end-limit on the submission of additional materials or the plan administrator's review of additional materials

and all of the above material was part of Christianson's administrative file. More trenchantly, neither party has challenged the use of this material in this litigation. Therefore, to the extent arguments about the timing of these letters are relevant to the analysis below, the Court considers them to be waived. *See Stafford v. Ford Motor Co.,* 790 F.2d 702, 706 (8th Cir.1986) ("The trial judge should not have to assume the role of an advocate on behalf of a litigant whose counsel has failed to assert a legal theory or argument. . . .").

specific theory of recovery at issue. *See Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir.1992). In essence, the court determines whether there is a need for a trial. *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505.

## Analysis

### I. ERISA Standard of Review

An ERISA plan participant may bring a civil suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Where, as here, a plan gives the administrator "discretionary authority to determine eligibility for benefits," the Court generally reviews the administrator's decision for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). This deferential standard stems from courts' hesitancy to interfere with the administration of benefits plans. *Layes v. Mead Corp.,* 132 F.3d 1246, 1250 (8th Cir.1998).

Courts will apply a less deferential standard of review to a plan administrator's decision, however, when a plaintiff presents "material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir.1998). Not only must the evidence be material and probative, but the alleged conflict or procedural irregularity must be tied to the denial of benefits. *Id.* at 1161. To obtain review under the less deferential standard, a plaintiff must offer evidence that "gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." *Layes,* 132 F.3d at 1250 (internal quotation marks omitted).

Here, the Court need not decide whether, or to what extent, to deviate from the abuse-of-discretion standard of review because, on the facts of the case, any standard produces the same result. *See Barnhart v. UNUM Life Ins. Co.,* 179 F.3d 583, 589 n. 9 (8th Cir.1999) (noting that a plaintiff who satisfies *Woo's* threshold requirements "will more than likely have substantial evidence showing that the fiduciary's decision was arbitrary and capricious once the sliding scale is invoked to lessen the court's deference for the administrator's decision").

### II. Application of the Abuse of Discretion Standard

■ Under an abuse of discretion standard, a plan administrator's decision to deny benefits must stand if it is reasonable, that is, if it is supported by "substantial evidence." *Fletcher–Merrit v. NorAm Energy Corp.,* 250 F.3d 1174, 1179 (8th Cir.2001). Substantial evidence is "more than a scintilla but less than a preponderance." *Woo,* 144 F.3d at 1162 (quoting *Donaho v. FMC Corp.,* 74 F.3d 894, 900 n. 10 (8th Cir.1996)). As long as the plan administrator's "findings are reasonable, they may not be displaced on review even if the court might have reached a different result had the matter been before it de novo." *Donaho,* 74 F.3d at 900. Ultimately,

a trustee decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision. Put another way, the committee's decision need not be the only sensible interpretation, so long as its decision offer[s] a reasoned explanation, based on the evidence, for a particular outcome.

*Id.* at 899 (emphasis in original) (internal quotation marks and citations omitted).

In reviewing the plan administrator's decision, the Court must first identify the policy provision the decision was based upon. Here, the policy's tobacco exclusion contains two distinct clauses. First, the policy excludes "[c]harges *related* in any way, shape, or form to, or complicated by, the use of tobacco products...." (Grell Aff. Ex. 1 at 18 (emphasis added).) This language (hereinafter, the "related ... to" clause) implicates "the use of tobacco products" and requires a direct, causal link between claimed medical expenses and tobacco use. Second, the policy also excludes "[c]harges ... for treatment of an ailment or condition *associated with* the use of tobacco." (*Id.* (emphasis added).) This language (hereinafter, the "associated with" clause) is quite broad indeed and requires no causal nexus between smoking and the beneficiary's condition.[3]

While Poly–America has invoked the "associated with" clause throughout the briefing and argument of this motion, it is of no consequence here because the plan administrator relied exclusively upon the more limited "related ... to" clause in denying benefits. In the initial denial letter, the plan administrator specifically stated that Christianson's claims were denied because "your deep venous thrombosis condition was *related to* tobacco abuse." (Nolan Aff. Ex. 1 (emphasis added).) Likewise, in the subsequent denial letter, the plan administrator justified the denial of benefits on the ground that "[m]edical records pertaining to the charges in question indicate that your deep venous thrombosis condition was *related to* tobacco abuse/dependency." (Nolan Aff. Ex. 4 (emphasis added).) The Court will therefore examine the record to determine whether it contains substantial evidence to support a denial of benefits under the "related ... to" clause.[4]

---

3. The "associated with" clause is so broad, in fact, that it does not appear to even require that the beneficiary be a smoker. For instance, a nonsmoker with heart disease or lung cancer undoubtedly has "an ailment ... associated with the use of tobacco." (Grell Aff. Ex. 1 at 18.) In oral argument, Poly–America asserted that the clause was designed to ensure flexible decision-making: "[W]e're trying to maintain some discretion here so we can look at it on a case-by-case basis and–and make decisions about, well, does Mr. Christianson get coverage here, and does he not get it here...." (Audio Tape: Oral Argument (September 30, 2003).) The problem with this sort of unfettered discretion, of course, is that it gives rise to the kind of arbitrary and capricious decision-making forbidden by ERISA. Moreover, the uncertain application of the exclusion–seemingly antithetical to the sort of planning insurance is designed to facilitate–raises questions as to whether the exclusion renders the policy coverage illusory. However, while the Court has significant doubts as to the validity of this clause, it need not reach the question since the plan administrator explicitly relied upon the more limited "related to" language of the tobacco exclusion, as discussed *infra.*

4. Counsel for Poly–America made a mystifying distinction in oral argument between the first and "subsequent letters" that Christianson received. As counsel stated, "The first letter denying coverage did not rely on that-on that 'associated with' language but the-the subsequent letters Mr. Christian[son] received did, and they're in the record." (Audio Tape: Oral Argument (Sept. 30, 2003).) The Court's review of the record before it finds only *two* letters, the initial denial (dated June 1, 2001) and the denial on appeal (dated July 19, 2001). In each of these, the plan administrator quotes the tobacco exclusion in its entirety and then invokes the "related ... to" language to deny benefits. Regardless, even were the plan administrator to subsequently invoke the "associated with" clause, his obligation through the appeals process is to justify his initial decision *as communicated to the plan participant,* not to play a kind of shell game with the beneficiary in which he invokes different policy provisions as the appeal proceeds. At the very least, this would violate the plan's obligation "not [to] *mislead* plan participants." *Christianson v. Poly–America,* Civ. No. 02–1384 (RHK/AJB), 2002 WL 31421684, slip op. at 8 n. 5 (D.Minn. Oct. 25, 2002) (Kyle, J.) (emphasis in the original).

■ The Court finds that the record does not contain substantial evidence. As counsel for Poly–America acknowledged at oral argument, to deny benefits under the "related ... to" clause "you do need to show a direct link between a particular beneficiary's problem and their use of tobacco." (Audio Tape: Oral Argument (Sept. 30, 2003).) Likewise, the dictionary defines "related" as "connected by reason of an established or discoverable relation." *Webster's Third New International Dictionary* 1916 (1986). Here, the record contains barely a scintilla of that "direct link" or "established or discoverable relation" between Christianson's medical expenses and his use of tobacco. Indeed, such a *discoverable* relation, as counsel for Poly–America stated at oral argument, might not exist:

> [H]ow does anybody prove, given, you know, that tobacco use causes so many disorders that have so many causal contributing factors, how does anybody prove that tobacco use definitely caused a particular episode of an illness.

(Audio Tape: Oral Argument (Sept. 30, 2003).) Although the record is replete with evidence that tobacco use is a "risk factor" for deep vein thrombosis, a risk factor is merely "[s]omething that *may* increase the chance of developing a disease," (National Institutes of Health, "Cancer.gov Dictionary," *available at,* http://www.nci.nih.gov/dictionary/db_alpha.aspx?expand=R (emphasis added)); *see also* Fed.R.Evid. 201(b), not a substitute for demonstrating relatedness in this instance.

While Poly–America might have been able to bridge this gap in the evidence by providing competent expert testimony, the opinion it sought falls far short of that standard. To review its denial of benefits, Poly–America retained Dr. Jerry Gurkoff, an osteopath and orthopedic surgeon.[5] His opinion reads in total:

> Pursuant to your request, I have reviewed Mr. Christianson's recent medical records in conjunction with the 2001 Poly America Medical Benefit Plan. The Plan specifically states that it does not cover: "Charges related in any way, or form to, or complicated by, the use of Tobacco products or for the treatment of an ailment or condition associated with the use of tobacco."[6]
>
> It is my professional opinion, based upon a reasonable degree of medical certainty, that the charges relating to Mr.

---

5. In general, osteopaths are physicians who receive "extra training in the musculoskeletal system" and "use their hands to diagnose injury and illness." (*See* American Osteopathic Association, "What Is a Doctor of Osteopathic Medicine," *available at* http://www.aoa-net.org/Consumers/whatdo01.htm); *see also* Fed.R.Evid. 201(b). Similarly, "[t]he orthopaedist's scope of practice includes disorders of the body's bones, joints, ligaments, muscles, and tendons." (*See* American Academy of Orthopaedic Surgeons, "About the AAOS," *available at,* http://www.aaos.org/wordhtml/backgrnd. htm); *see also* Fed.R.Evid. 201(b). Reviewing these qualifications–which exclusively relate to the musculoskeletal system–Dr. Gurkoff appears to be an odd choice to offer an expert opinion on matters of vascular health. (*See generally* WebMD, "Deep Vein Thrombosis: Who To See," *available at,* http://my.webmd.com/content/healthwise/ 157/39072 (listing family practitioner, internist, and vascular surgeon among those physicians treating deep vein thrombosis).) As counsel for Poly–America aptly conceded in oral argument, why the plan administrator selected a physician with Dr. Gurkoff's set of skills to review the file is "a mystery." (Audio Tape: Oral Argument (Sept. 30, 2003).)

6. This quotation of the exclusionary language contains no less than three deviations from the language of the policy, which actually reads: "Charges related in any way, *shape,* or form to, or complicated by, the use of *tobacco* [with a lowercase 't'] products or for [no 'the'] treatment of an ailment or condition associated with the use of tobacco." (*See* Grell Aff. Ex. 1 at 18 (emphasis added).)

Christianson's deep venous thrombosis are not covered by the plan.

(Nolan Aff. Ex. 6 (Gurkoff Opinion).) This opinion, without indication as to its methodology or rationale, fails to articulate any medical basis at all for its findings. Rather, it merely parrots language of the exclusion and offers a "[b]ald-faced conclusion[ ]" devoid of *specific reasons* for the decision." *Richardson v. Central States, Southeast and Southwest Areas Pension Fund,* 645 F.2d 660, 665 (8th Cir.1981) (emphasis in original). Because the Court is charged with examining the *quality* of evidence relied upon by the plan administrator, *see Phillips–Foster v. UNUM Life Ins., Co.,* 302 F.3d 785, 798 (8th Cir.2002), and because the quality of Dr. Gurkoff's opinion is decidedly wanting, the Court finds that the plan administrator was unreasonable to rely upon it.[7]

The remaining medical opinions speak with one voice. Dr. Oliver, Christianson's primary care doctor, opines that his deep vein thrombosis was "ideopathic," or of an unknown cause or origin. (Nolan Aff. Ex. 6.) Medical records generated by Dr. Taggart at the time of admission support this conclusion, noting the absence of *"real* risk factors"[8] and suggesting an "investigation for the factor V Leiden mutation," the most common *genetic* cause of the condition. (Nolan Aff. Ex. 2 (emphasis added).) Indeed, the medical records generated by

Dr. Terzian, an internist and Fellow of the American College of Physicians, state that Christianson "had *no* risk factors for deep venous thrombosis," (Nolan Aff. Ex. 3 (emphasis added).) On subsequent review of the file, Dr. Terzian found "nothing in Dr. Taggart's and my dictation to support [the plan administrator's] claim" that Christianson's "deep vein thrombosis was related to tobacco abuse." (Nolan Aff. Ex. 7.)

Examining the evidence before the plan administrator, the Court finds barely a scintilla of evidence supporting "a direct link" or "known or discoverable relation" between Christianson's smoking and his deep vein thrombosis. Rather, as counsel for Christianson stated in oral argument, the plan administrator appears to have operated on the basis of "a faulty syllogism" that proceeds:

> [First,] [s]ome people have DVT [deep vein thrombosis] that is related to tobacco abuse. Mr. Christianson–the second part of the syllogism would be–Mr. Christianson is a smoker. Therefore, and it's the faulty conclusion, his DVT is related to smoking.

(Audio Tape: Oral Argument (Sept. 30, 2003).) This sort of flawed thinking represents exactly the sort of arbitrary and capricious administrative decision-making that judicial review is designed to unseat. Unsupported by substantial evidence, Poly–America's denial of benefits is unjust-

---

7. While the Court need not determine the level of deference due the plan administrator's decision, the quality of and qualifications supporting Dr. Gurkoff's opinion combine to give Christianson his strongest argument for lowering the standard of review. Significantly, these irregularities are tied to the plan administrator's decision because he explicitly relied on that opinion in denying benefits. (*See* Nolan Aff. Ex. 4 (listing Dr. Gurkoff's "expert opinion" among the "elements … considered in my review").)

8. Although Dr. Taggart does state that Christianson "has minimal risk factors for deep venous thrombosis, other than prolonged standing and tobacco abuse," she also states that "he has no *real* risk factors…." (Nolan Aff. Ex. 2 (emphasis added).) The only way to read these statements together is to conclude that she did not consider tobacco abuse to be a "real" risk factor. Similarly, the "secondary diagnosis" of tobacco abuse tells the Court nothing about relatedness, as Christianson has demonstrated with examples of medical records listing unrelated conditions, such as tobacco abuse where the patient was being treated for a back injury and a vasectomy where the patient had suffered a heart attack. (*See* Second Nolan Aff. Exs. A & B.)

ifiable under any standard. Accordingly, Christianson is entitled to summary judgment.

### III. Attorneys' Fees

■ Christianson has moved for attorneys' fees and costs. The award of attorneys' fees and costs under ERISA is discretionary and there is no presumption favoring the award of fees to either party. *Martin v. Arkansas Blue Cross and Blue Shield,* 299 F.3d 966, 971–72 (8th Cir.2002) (en banc). In determining whether to award fees and costs, courts should consider the five factors set out by the Eighth Circuit in *Lawrence v. Westerhaus:*

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

749 F.2d 494, 496 (8th Cir.1984). These five factors "are by no means exclusive or to be mechanically applied." *Martin,* 299 F.3d at 972. Rather, "the district courts should use the factors and other relevant considerations as general guidelines for determining when a fee is appropriate." *Id.*

■ Reviewing the relevant considerations, the Court finds that Christianson is entitled to fees and costs. First, Poly–America committed a serious breach of its fiduciary duty. Second, there is nothing before the Court to indicate that Poly–America would be unable to pay fees and costs or that they would unduly burden other beneficiaries. Third, the award in this instance would help deter such breaches in the future. Fourth, Christianson's action benefits all plan participants by providing judicial interpretation of a significant policy exclusion.[9] Finally, the relative merits of the case clearly favor Christianson. Accordingly, because all the relevant factors tip in favor of Christianson, he is entitled to attorneys' fees and costs.

### Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED:**

1. Plaintiff's Motion for Summary Judgment (Doc. 15) is **GRANTED;**

2. Defendant's Cross–Motion for Summary Judgment (Doc. 18) is **DENIED;**

3. Plaintiff is entitled to past-due benefits, prejudgment interest,[10] attorneys' fees and costs;[11]

---

9. The Court is not persuaded otherwise by Poly–America's assertion that its only other recourse would be to deny coverage to smokers altogether. Even were Poly–America to alter its medical plan accordingly, *all* plan beneficiaries would benefit from that certainty because they could address gaps in their coverage by purchasing additional insurance. The current exclusion, which depends on the caprices of the plan administrator, discourages that sort of planning.

10. Prejudgment interest is appropriate because (1) Poly–America "has continued to have use of th[e] money," (2) "the exact amount of liability on the plan[] was never in doubt," and (3) "an award of prejudgment interest is necessary in order ... [to] obtain 'appropriate equitable relief.'" *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1218 (8th Cir.1981) (quoting 29 U.S.C. § 1132(a)(3)(B)).

11. Plaintiff shall submit an affidavit and supporting documents as to attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) within thirty days.

**LET JUDGMENT BE ENTERED AC-CORDINGLY.**