**DAYTON DEVELOPMENT COMPANY, Plaintiff,**

v.

**GILMAN FINANCIAL SERVICES, INC., Defendant.**

**No. CIV. 02–2962(RHK/AJB).**

United States District Court, D. Minnesota.

Nov. 6, 2003.

Wendy J. Wildung and Erik J. Girvan, Faegre & Benson LLP, Minneapolis, MN, for Plaintiff.

Timothy D. Kelly and Erin K. Fogarty Lisle, Kelly & Berens, P.A., Minneapolis, MN, for Defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

This matter comes before the Court on cross-motions for summary judgment. Plaintiff Dayton Development Company ("Dayton") has sued Gilman Financial Services, Inc. ("Gilman") seeking to enforce a lease repurchase option for certain retail display fixtures. Dayton has moved for summary judgment on the ground that Gilman lacks standing to challenge a lease to which it is not a party. Gilman has filed a cross motion on the grounds that Dayton improperly calculated the price of the repurchase option as a matter of law. For the reasons set forth below, the Court will grant Dayton's motion and deny Gilman's motion.

### Background

On December 22, 1994, Target, a Minnesota-based retail chain, sold the shelving, racks, display counters, and other fixtures

("the fixtures") from 107 Target stores in 22 states to Equilease in exchange for over eighty-four million dollars. Target and Equilease simultaneously executed a lease agreement ("the User Lease") in which Target leased the fixtures back from Equilease for five years, with the right to renew for two additional years. Under the User Lease, Target retained an option to repurchase all or a portion of the fixtures at the end of the lease for "Fair Market Value," defined in Section 8 as:

> [T]he purchase price or rental, as the case may be, for the applicable Equipment that would be obtained in an arm's length transaction between an informed and willing buyer or a lessee not currently in possession under no compulsion to buy and an informed and willing seller under no compulsion to sell, as determined in the good faith exercise of the judgment of Lessor [Equilease] and Lessee [Dayton] at the applicable time and assuming that the Lease were no longer in force and effect.

(Wildung Aff. Ex. 6 at 8.)

Equilease promptly resold the fixtures to CLI Equipment Acquisition Corporation II ("CLI"), which leased the fixtures back to an Equilease affiliate pursuant to a second lease ("the Master Lease"). Under this agreement, the Equilease affiliate was permitted to purchase the fixtures for a price determined, in part, by the user lease. Section 26(a) of the Master Lease reads, in pertinent part:

> In the event that the User [Target, under the User Lease] is entitled or permitted to purchase all or part of the Equipment pursuant to the User Lease and elects to do so ... [then] Lessee [the Equilease affiliate] shall have the obligation to purchase the same Equipment (the "Repurchased Equipment") from Lessor [CLI] hereunder upon the following terms and conditions and to resell such Repurchased Equipment to User immediately thereafter in accordance with the terms and conditions of the User Lease.

(Wildung Aff. Ex. 7 at 29.) The purchase price was to be determined by "the purchase price or other amount to be paid by or on behalf of the User under the User Lease to the lessor under the User Lease," minus the leasehold interest value. (*Id.* at 30.) Upon tender of that price, "Lessor *shall transfer,* by bill of sale or other appropriate agreement, all Lessor's right, title and interest in and to the purchased Equipment." (*Id.* at 32 (emphasis added).)

Since 1994, the parties to these agreements have changed several times. On January 24, 1995, Dayton acquired the interest of Equilease and its affiliates in the 1994 transactions. As a result, Dayton is currently the lessor under the User Lease and the lessee under the Master Lease. On December 18, 1996, Gilman acquired for one million dollars the residual interest in the rights of the Lessor under the Master Lease. The purchase agreement explicitly stated that Gilman was acquiring the fixtures "encumbered by and subordinate to ... the rights of User [Target] under the User Lease and the User Lessor [Dayton] under the Master Lease." (Wildung Aff. Ex. 9 ¶ 1.1.) To secure Dayton's consent to the transaction, Gilman agreed to perform all the lessor's obligations under the Master Lease. (*Id.* at ¶ 3.)

After renewing the User Lease for both of its renewal terms, Target gave Dayton written notice of Target's intention to repurchase the fixtures at the end of the User Lease on December 22, 2001. (Wildung Aff. Ex. 13 at G000254.) Dayton forwarded the notice to Gilman. (*Id.* at 000253.) After deriving a purchase price based on the "fair market value" term of the User Lease, Dayton advised Gilman

that it was prepared to pay $425,023 for the fixtures-in essence, their scrap value. (Wildung Aff. Ex. 16 at DDCO 00291.) Gilman rejected the price as inadequate. (Wildung Aff. Ex. 19.) This lawsuit followed.

## Standard of Decision

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). It is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court views the evidence, as well as all reasonable inferences, in a light most favorable to the nonmoving party. *See Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996); *see Adkison v. G.D. Searle & Co.,* 971 F.2d 132, 134 (8th Cir.1992). The moving party carries the burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.,* 224 F.3d 735, 738 (8th Cir.2000). The nonmoving party may not rest upon the allegations or denials of its pleadings. Rather, the nonmovant must establish the existence of specific facts that create a genuine issue for trial. Neither mere allegations nor denials are sufficient. *See Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. 2505.

On summary judgment, the court does not weigh facts or determine the credibility of affidavits and other evidence. *See id.* at 249, 106 S.Ct. 2505. The nonmovant cannot, however, avoid summary judgment by highlighting some alleged factual dispute between the parties. Instead, the disputed fact must be "outcome determinative under prevailing law"; it must be material to an essential element of the specific theory of recovery at issue. *See Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir.1992). In essence, the court determines whether there is a need for a trial. *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505.

## Analysis

Dayton has moved for summary judgment on the ground that Gilman does not have standing to challenge the calculation of the purchase price under the User Lease because it is neither a party to that agreement nor a third-party beneficiary. Gilman has filed a cross motion asserting that summary judgment in its favor is appropriate because Dayton failed to properly renew the User Lease and miscalculated the fair market value of the fixtures as a matter of law.[1] Because the Court finds that Gilman is not a third-party beneficiary of the User Lease, it need not reach the question of whether the fair market value was properly calculated under that agreement.

---

1. Gilman argues that the User Lease was not in effect because Target failed to give Dayton proper written notice of its intent to renew the agreement. Although this issue is arguably a threshold question, it need not occupy space here. Simply put, Gilman cannot seek to enforce the notice provisions of a contract to which it is neither a party nor third-party beneficiary. *See infra.* While Gilman has offered a late-breaking argument—not alleged in the pleadings and arguably in violation of the notice provisions of the Master Lease—that the portion of the Master Lease prohibiting modification of the User Agreement without written consent gives Gilman standing, there is nothing before the Court to suggest that a lack of notice by Target to Dayton acted as a modification of the User Lease. Rather, it appears to have been—at most—a waiver of a right between these parties. Semantic distinctions aside, Gilman has identified no plausible prejudice to it based upon Target's alleged failure to provide notice to Dayton.

## I. Third–Party Beneficiary

Dayton has moved for summary judgment on the ground that Gilman has no standing to challenge Dayton's calculation of the "fair market value" of the fixtures under the User Lease. Gilman, conversely, asserts standing under a novel theory:

> [O]ur standing is kind of like Tinker[ ] to Evers to Chance, A to B to C, and that Chance has standing to beef about Tinker['s] throw to the second baseman because he is ultimately going to get the out.

(Tr. Oral Argument at 23). The Court disagrees.[2]

A party, such as Gilman, that is a stranger to a contract may nonetheless assert a contractual claim if it is a "third-party beneficiary," i.e., if the contract was made for that party's direct benefit. *See Buchman Plumbing Co. v. Regents of the Univ. of Minn.*, 298 Minn. 328, 215 N.W.2d 479, 483 (1974). Under Minnesota law, the Court may recognize third-party beneficiary rights if (1) such recognition is "appropriate" under the circumstances, and (2) the third party meets either the "intent to benefit" test or the "duty owed" test. *See Cretex Cos. v. Construction Leaders*, 342 N.W.2d 135, 139 (Minn.1984). Focusing on the second half of this analysis, Dayton argues that Gilman meets neither of these tests. The Court will address each in turn.

## A. The "Intent to Benefit" Test

Gilman does not satisfy the intent to benefit test. "The intent to benefit test generally requires that 'the contract must express some intent by the parties to benefit the third party through contractual performance.' " *Norwest Fin. Leasing, Inc. v. Morgan Whitney*, 787 F.Supp. 895, 898 (D.Minn.1992) (Doty, J.) (quoting *Chard Realty v. City of Shakopee*, 392 N.W.2d 716, 720–21 (Minn.Ct.App.1986)). In general, "when there is no reference to the third party in the contract, there is no intent to benefit the third party." *See 614 Co. v. Minneapolis Community Development Agency*, 547 N.W.2d 400, 410 (Minn. Ct.App.1996). The absence of the third party's name, however, does not preclude a finding of intent to benefit "if the circumstances show otherwise." *Julian Johnson Constr. Corp. v. Parranto*, 352 N.W.2d 808, 811 (Minn.Ct.App.1984).

Gilman is not mentioned in the User Lease. Gilman therefore must rely on the interrelationship between the User and Master Leases to evoke "circumstances" sufficient to demonstrate an intent to benefit. The User Lease, however, is an independent document and expressly states any relationship between the parties is "based entirely on, and circumscribed by, the provisions of this Lease." (Wildung Aff. Ex. 6 ¶ 18(i).) Even the *Master* Lease makes clear that it alone "constitutes the entire understanding between

---

**2.** As long-suffering fans of the Chicago Cubs are well aware, shortstop Joe Tinker, second baseman Johnny Evers, and first baseman Frank Chance constituted the Cubs' legendary (and sometimes infamous) double-play combination, immortalized by Franklin Pierce Adams in a 1910 poem:

> These are the saddest of possible words:
> "Tinker to Evers to Chance."
> Trio of bear cubs, and fleeter than birds,
> Tinker and Evers and Chance.　　　.
> Ruthlessly pricking our gonfalon bubble,

> Making a Giant hit into a double—
> Words that are heavy with nothing but trouble:
> "Tinker to Evers to Chance."

New York Evening Mail (July 10, 1910). Tinker, Evers, and Chance are all in the Hall of Fame on the basis of their inclusion in Adams's poem. While the Court enjoys counsel's creativity, it finds that Gilman is out in left field (rather than on first base) with regard to the User Lease.

[Dayton and Gilman] with respect to the matters set forth herein." (*Id.* Ex. 7 ¶ 29(e).) While the Master Lease does invoke discrete provisions of the User Lease, it does so narrowly and specifically. Therefore, there is nothing in the relationship between the two documents to generate the inference that Gilman was an intended beneficiary of the User Lease.

## B. The "Duty Owed" Test

■ Likewise, Gilman fails to satisfy the "duty owed" test. To meet this test, "the promisor's performance under the contract must discharge a duty otherwise owed the third party by the promisee." *Cretex Cos.,* 342 N.W.2d at 138; *see also* Restatement (Second) of Contracts § 302 (requiring satisfaction "of an obligation of the Promisee to the beneficiary"). The obligation to be discharged must "arise[ ] from the . . . agreement" itself, and not "from a separate contract." *Norwest Fin.,* 787 F.Supp. at 900; *see also Cretex Cos.,* 342 N.W.2d at 138 (duty-owed test not met where obligation arises from "separate contracts"). Here, Gilman asserts that the duty owed arises from the Master Lease. Such obligation clearly arises outside the four corners of the User Lease. Accordingly, Gilman is not a third-party beneficiary under this contract.[3]

Despite the extraordinary amount of paper this case has generated, the Court finds it to be a relatively simple matter: Gilman, with eyes wide open, entered into an agreement in which Dayton and Target—two related parties—maintained an enormous latitude in determining the eventual purchase price. While Gilman argues that this result amounts to a windfall for Dayton, it represents the agreement Gilman signed. As the Minnesota Supreme Court has stated,

> When two competent parties who can readily read and write, sign [an agreement] . . . there is [usually] nothing left for a Court to do but to find a judgment . . . . People who sign documents which are plainly written must expect to be held liable thereon. Otherwise written documents would be entirely worthless and chaos would prevail in our business relations.

*Watkins Prod., Inc. v. Butterfield,* 274 Minn. 378, 144 N.W.2d 56, 58 (1966) (internal quotation omitted). Having signed such a "plainly written" document—no matter how ill-advisedly—Gilman must now comply with it. Accordingly, the Court will grant Dayton's motion and deny Gilman's motion.

## Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED:**

---

**3.** Gilman argues that it has standing under a number of alternate theories, none of which has merit. First, the User Lease and Master Lease do not constitute a single, indivisible contract because these leases are between different parties and contain integration clauses. *See Farrell v. Johnson,* 442 N.W.2d 805, 806–07 (Minn.Ct.App.1989); (*see also* Wildung Aff. Ex. 6 ¶ 18(f), Ex. 7 ¶ 29(e).) Second, Gilman's estoppel argument is expressly precluded by the Master Lease, which states that "no course of dealing between the Lessee and the Lessor . . . shall operate as a waiver of any of the rights and remedies of Lessee and Les-

sor." (Wildung Aff. Ex. 7 ¶ 29(a).) Finally, Gilman argues that Dayton breached the duty of good faith and fair dealing under the Master Lease by changing the definition of fair market value in the User Lease. Under Minnesota law, however, the duty of good faith and fair dealing is *not* actionable where the alleged "bad faith" actions involve the performance of terms that are not part of the contract. *See Beer Wholesalers, Inc. v. Miller Brewing Co.,* 426 N.W.2d 438, 441–42 (Minn. Ct.App.1988). Dayton cannot therefore breach its duty under the Master Lease by its performance of the User Lease.

1. Plaintiff's Motion for Summary Judgment (Doc. 37) is **GRANTED**;

2. Defendant's Motion for Summary Judgment (Doc. 40) is **DENIED**;

3. Defendant is in breach of the Master Lease and must convey all right, title, and interest in the fixtures in exchange for $ 423,023.

4. The Counterclaim of Gilman Financial Services, Inc. (Doc. No. 4) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**