# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-4071

_____

| | | |
|---|---|---|
| Dayton Development Company, a Minnesota corporation, | * * * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Gilman Financial Services, Inc., a Delaware corporation, | * * | |
| | * | |
| Appellant. | * | |

_____

Submitted: December 16, 2004
Filed: August 23, 2005

_____

Before BYE, JOHN R. GIBSON, and GRUENDER, Circuit Judges.

_____

BYE, Circuit Judge.

This suit concerns a lease of fixtures in several Target stores across the country. Gilman Financial Services, Inc. (Gilman) appeals the district court's[1] grant of summary judgment in favor of Dayton Development Company (Dayton). We affirm.

_____

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

I

In 1994, Target, a Minnesota-based retail chain, sold the fixtures (shelving, racks, display counters, and other fixtures) in over one hundred of its stores. Target simultaneously executed an agreement, the User Lease, with the purchaser to lease the fixtures back for five years (with the right to renew for two additional years) with an option to repurchase the fixtures at the end of the lease period. Target entered this sale and leaseback transaction to obtain certain tax advantages.

The transaction was actually a double sale and leaseback in which the purchaser/lessor under the User Lease promptly resold the fixtures to another party, who leased the fixtures to yet another party under a second lease, the Master Lease. The leasehold interests under both the User and Master Leases then changed hands several times. For purposes of this litigation, Target is the lessee under the User Lease while Dayton is the lessor under that lease; Dayton is also the lessee under the Master Lease while Gilman is the lessor under that lease.

Target, after exercising its option to renew the User Lease for two additional years, gave notice of its intention to repurchase the fixtures. The User Lease gave Target the right to repurchase the fixtures at "Fair Market Value," which was defined as the amount

> that would be obtained in an arm's length transaction between an informed and willing buyer or a lessee not currently in possession under no compulsion to buy and an informed and willing seller under no compulsion to sell, as determined in the good faith exercise of the judgment of Lessor [Dayton] and Lessee [Target].

In the event the parties to the User Lease could not agree upon the fixtures' fair market value, the User Lease had an alternative valuation method which provided fair market value would be determined "by a knowledgeable independent appraiser

to be mutually agreed upon by the parties or, failing such agreement, by a panel of three such appraisers, one selected by Lessor [Dayton], one selected by Lessee [Target] and a third selected by the first two."

Upon Target exercising its repurchase option under the User Lease, the Master Lease obligated Dayton (lessee) to purchase the fixtures from Gilman (lessor) "and to resell such Repurchased Equipment to User [Target] immediately thereafter in accordance with the terms and conditions of the User Lease." The Master Lease further provided the purchase price between Dayton and Gilman would be equal to "the purchase price or other amount to be paid by or on behalf of the User [Target] under the User Lease to the lessor under the User Lease [Dayton] . . . minus [] the Leasehold Interest Value." In other words, the purchase price under the Master Lease was directly tied to the repurchase price under the User Lease.

The parties to the User Lease, Dayton and Target, agreed in good faith upon a fair market value of $423,023 for the fixtures without having to resort to the alternative valuation method under the User Lease. Dayton then advised Gilman it was prepared to purchase the fixtures from Gilman under the Master Lease for $423,023 so that Dayton could deliver title to the fixtures to Target. Gilman rejected the price as inadequate, and refused to deliver title.

Dayton then commenced this suit seeking a court order compelling Gilman to transfer title in the fixtures to Dayton for $423,023. Gilman counterclaimed alleging Dayton breached the two leases and sought to compel Dayton to participate in the alternative valuation method under the User Lease. Gilman further contended Target never validly renewed the User Lease, and thus could not exercise its right to repurchase the fixtures. Both parties moved for summary judgment. The district court concluded Gilman lacked standing to challenge the price of the fixture repurchase because it was not a party to the User Lease or an intended third-party beneficiary. The district court then denied Gilman's motion for summary judgment

and granted Dayton's.  This timely appeal followed in which Gilman contends 1) it is a third-party beneficiary of the User Lease; 2) the User and Master Lease are a single, indivisible contract; and 3) Dayton breached the Master Lease by accepting Target's renewal of the User Lease without requiring written notice, and thus Target could not exercise its right to repurchase the fixtures.

II

We review the district court's grant of summary judgment de novo.  Trs. of Graphic Communication Int'l Union Local 1B Health and Welfare Fund "A" v. Tension Envelope Corp., 374 F.3d 633, 635 (8th Cir. 2004).  "In reviewing the grant of summary judgment, we likewise review de novo the district court's interpretation of unambiguous contract language."  Id.

## A.     Third-Party Beneficiary

Gilman primarily argues it is a third-party beneficiary of the User Lease, and as such had the right to compel Dayton to participate in the alternative valuation method under the User Lease.  We disagree.

Minnesota applies Section 302 of the Restatement (Second) of Contracts to determine whether a party is an intended third-party beneficiary of a contract. See Schoffman v. Cent. States Diversified, Inc., 69 F.3d 215, 217 n.3 (8th Cir. 1995). Subsection one provides:

> Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

-4-

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Subparagraph (a) of section 302(1) has been referred to as setting forth a "duty owed" test, that is, "the promisor's performance under the contract must discharge a duty otherwise owed the third party by the promisee." Cretex Cos., Inc. v. Constr. Leaders, Inc., 342 N.W.2d 135, 138 (Minn. 1984). Subparagraph (b) has been referred to as setting forth an "intent to benefit" test, that is, "the contract must express some intent by the parties to benefit the third party through contractual performance[.]" Id. We agree with the district court that Gilman does not satisfy either the "duty owed" or "intent to benefit" test with respect to the User Lease and thus was not an intended third-party beneficiary of that contract.

### 1. The Intent to Benefit Test

"The intent to benefit test generally requires that 'the contract must express some intent by the parties to benefit the third party through contractual performance.'" Norwest Fin. Leasing, Inc. v. Morgan Whitney, Inc., 787 F. Supp. 895, 898 (D. Minn. 1992) (quoting Chard Realty, Inc. v. City of Shakopee, 392 N.W.2d 716, 720-21 (Minn. Ct. App. 1986)). In most cases, "when there is no reference to the third party in the contract, there is no intent to benefit the third party." 614 Co. v. Minneapolis Cmty. Dev. Agency, 547 N.W.2d 400, 410 (Minn. Ct. App. 1996).

The User Lease did not refer to Gilman, the Master Lease, or the lessor of the Master Lease; in addition, both the Master Lease and User Lease contained integration clauses stating the contractual relationship between the parties to the

respective agreements constituted the entire understanding between the parties with respect to the matters set forth therein. Thus, there is a strong inference the parties to the User Lease (Dayton and Target) did not intend to benefit Gilman.

Gilman contends it was an intended beneficiary of the User Lease merely because the User Lease referred to the lessee's (Target's) right to repurchase the fixtures from the lessor (Dayton), who could only obtain title from the lessor of the Master Lease (Gilman). Gilman argues "when both simultaneously created contracts are viewed side by side, the consideration that passes from [Target], then is contractually required to be passed to [Gilman] in return for title." Gilman's Br. at 28-29.

The mere reference to Target's right to repurchase the fixtures and the fact the repurchase would ultimately require title to flow from Gilman through Dayton are not enough to make Gilman an intended third-party beneficiary of the User Lease. Instead, Gilman is merely an incidental beneficiary of the User Lease. For example, when "B contracts with A to buy a new car manufactured by C[,] C is an incidental beneficiary, even though the promise can only be performed if money is paid to C." Restatement (Second) of Contracts § 302(1), illus. 17. Likewise, in this case Target contracted with Dayton to repurchase the fixtures owned by Gilman. Even though that promise can only be performed if Dayton pays money to Gilman, Gilman is nonetheless merely an incidental beneficiary of the agreement between Target and Dayton. Gilman incidentally benefits from the contract between Dayton and Target because it receives money from Dayton for the fixtures. But Gilman is not an intended beneficiary of the contract between Dayton and Target and would not be able to enforce the User Lease in the same way the car manufacturer could not enforce the contract between B and A for the purchase of the car.

The parties to the User Lease did not enter into that agreement with the specific intent to benefit the lessor under the Master Lease. The Master Lease lessor would

merely be an incidental beneficiary of the User Lease in the event the option to repurchase was exercised under the User Lease.

## 2. The Duty Owed Test

To meet the "duty owed" test, "the promisor's performance under the contract must discharge a duty otherwise owed the third party by the promisee." Cretex, 342 N.W.2d at 138. Gilman contends it meets the "duty owed" test because Target's performance of the repurchase option will satisfy Dayton's duty to pay Gilman for title to the fixtures. This argument is easily refuted simply by recognizing the relevant duty under the User Lease and who the "promisor" and "promisee" are with respect to that promise. Gilman's argument necessarily fails because it relies upon the wrong duty, and confuses the "promisor" and "promisee."

The relevant contract is the User Lease. The relevant promise under the User Lease is Dayton's contractual obligation to return the fixtures to Target upon Target's payment of the agreed-upon price. Target is the promisee, that is, the one to whom the promise is made. Dayton is the promisor, that is, the one who undertakes the contractual obligation. Gilman would be an intended beneficiary of the User Lease only if Dayton's "performance of the promise will satisfy an obligation of the promisee [Target] to pay money to the beneficiary [Gilman]." Restatement (Second) of Contracts § 302(1)(a). But Target has no obligation to pay money to Gilman. Only Dayton has an obligation to pay money to Gilman. Gilman's flawed argument identifies Target as the promisor, and Dayton as the promisee, when the opposite is true.

In addition, as the district court noted, "[t]he obligation to be discharged must arise from the agreement itself, and not from a separate contract." Dayton Dev. Co. v. Gilman Fin. Servs., Inc., 299 F. Supp. 2d 933, 938 (D. Minn. 2003) (internal quotations omitted). Gilman contends the relevant duty is Dayton's duty to pay

Gilman for title to the fixtures. Dayton's obligation to pay Gilman arises from the Master Lease, however, not the User Lease. Thus, Gilman's argument depends on a duty that arises outside the very contract to which it claims to be an intended third-party beneficiary. It is axiomatic that the duty a third-party beneficiary is attempting to enforce must be a duty contracted for in the contract itself.

### B.      Single, Indivisible Contract

In the alternative, Gilman argues it need not be an intended third-party beneficiary of the User Lease because the User Lease and Master Lease should be construed as a single, indivisible contract. If the two leases are viewed as one contract, Gilman contends it has standing to enforce the alternative valuation method under the User Lease. The district court rejected this argument, explaining "the User Lease and Master Lease do not constitute a single, indivisible contract because these leases are between different parties and contain integration clauses." Id. at 938 n.3.

We are reluctant to adopt this part of the district court's reasoning because Minnesota law indicates separate instruments can be read as one even if they contain separate integration clauses, Farrell v. Johnson, 442 N.W.2d 805, 806 (Minn. Ct. App. 1989), and are between different parties, Peterson v. Miller Rubber Co. of N.Y., 24 F.2d 59, 62 (8th Cir. 1928) (applying Minnesota law). This is merely a partial victory for Gilman, however, because its contention (that it has standing to enforce the alternative valuation method under the User Lease) does not follow from its premise (that the User and Master Leases are a single, indivisible contract).

Under the plain language of the agreements, even when construed as one, Gilman does not have the right to be involved in the alternative valuation method set forth in the User Lease. Section 8 of the User Lease unambiguously gives Target and Dayton the right to determine the repurchase price, and only Target and Dayton have the right to use the alternative valuation method in the event they could not agree

-8-

upon a price. Nothing in either the User Lease or the Master Lease gives Gilman the right to be involved in the three-appraiser process set forth in the User Lease. To the contrary, the Master Lease plainly provides Gilman would be bound by the price determined under the provisions of the User Lease. Thus, as the district court noted:

> Despite the extraordinary amount of paper this case has generated, the Court finds it to be a relatively simple matter: Gilman, with eyes wide open, entered into an agreement in which Dayton and Target – two related parties – maintained an enormous latitude in determining the eventual purchase price. While Gilman argues that this result amounts to a windfall for Dayton, it represents the agreement Gilman signed. As the Minnesota Supreme Court has stated,
>
>> When two competent parties who can readily read and write, sign [an agreement] . . . there is [usually] nothing left for a Court to do but to find a judgment . . . . People who sign documents which are plainly written must expect to be held liable thereon. Otherwise written documents would be entirely worthless and chaos would prevail in our business relations. Watkins Prod. Inc. v. Butterfield, 274 Minn. 378, 144 N.W.2d 56, 58 (1966) (internal quotation omitted).

Dayton, 299 F. Supp. 2d at 938.


### C.    Renewal of the User Lease

Finally, Gilman contends Dayton breached the Master Lease by allowing Target to renew the User Lease without providing proper notice. Gilman relies upon Section 11.4 of the Master Lease, which states Dayton may modify the User Lease "only with prior written consent of [Gilman]." The User Lease allowed Target to renew the lease by notifying Dayton "in writing of Lessee's intention to exercise such option at least ninety (90) days prior to the expiration of the Initial Term." When

Target notified Dayton it was renewing the lease, it did not provide *written* notice. Gilman contends Dayton's renewal of the lease without requiring written notice from Target constituted a modification of the User Lease, and Dayton thereby breached the Master Lease because it did not get Gilman's consent.

We disagree. The reference in the Master Lease to "modify" or "modification" in this context are terms of art. It is clear both Target and Dayton continued their obligations under the User Lease notwithstanding Target's failure to comply with the written notice requirement. Minnesota law treats the continued performance of a party following the failure of the other party to comply with a contract term as a voluntary waiver of that contract term, rather than a "modification" of the contract. See Fischer v. Pinske, 243 N.W.2d 733, 735 (Minn. 1976) ("The fact that the parties behaved as if bound by the original contract persuasively demonstrates that they both could be found to have waived any requirement for a writing expressed in [the contract.]"); see also Patterson v. Stover, 400 N.W.2d 398, 401 (Minn. Ct. App. 1987) ("Ignoring a provision in a contract will constitute waiver if the party whom the provision favors continues to exercise his contract rights knowing that the condition is not met."). Because both Target and Dayton behaved as if bound by the original contract despite the lack of written notice, the lack of written notice did not constitute a modification of the User Lease, but rather a waiver of the requirement of written notice.

III

For the reasons expressed, we affirm the judgment of the district court.

_____