# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1482

_____

Macheca Transport Company,
doing business as Gateway Cold
Storage; David Macheca; Starlin
Macheca,

          Appellants,

   v.

Philadelphia Indemnity Insurance
Company,

          Appellee.

Appeal from the United States
District Court for the
Eastern District of Missouri.

_____

Submitted: January 11, 2011
Filed: August 9, 2011

_____

Before MURPHY, BYE, and MELLOY, Circuit Judges.

_____

BYE, Circuit Judge.

Macheca Transport Company and David and Starlin Macheca (Macheca) sued Philadelphia Indemnity Insurance Company (Philadelphia) seeking insurance coverage for damages resulting from a pipe rupture in Macheca's refrigerated warehouse. After we reversed the original grant of summary judgment in favor of Philadelphia, see Macheca Transp. Co. v. Phila. Indem. Ins. Co., 463 F.3d 827 (8th Cir. 2006) (Macheca I), the district court granted Philadelphia's renewed motion for

summary judgment on one of two coverage theories advanced by Macheca, and dismissed Macheca's vexatious refusal to pay claim. The case proceeded to trial on the remaining theory of coverage, which a jury resolved in Philadelphia's favor.

Macheca appeals challenging the district court's grant of Philadelphia's motion for summary judgment on Macheca's first coverage theory and the dismissal of Macheca's vexatious refusal to pay claim. Macheca also raises several claims of error with respect to the second theory of coverage submitted to the jury, including a claim of instructional error. We affirm in part, reverse in part, and remand.

I

Macheca operates a refrigerated warehouse in St. Louis, Missouri. On November 18, 2001, an ammonia leak occurred on the sixth floor of the warehouse after a refrigeration pipe ruptured. The pipe ruptured when the ceiling support system, from which the pipes were suspended, failed. The weight of ice which had accumulated on the pipe contributed to the failure. The refrigeration pipe fell and landed on pallets of product inside the warehouse. Ammonia leaked from the ruptured pipe and caused damage to the warehouse floors and walls, as well as the product stored inside the warehouse.

Prior to the pipe rupture, Macheca had purchased an all-risk insurance policy from Philadelphia which provided coverage for damage to the warehouse and its contents, subject to certain exclusions and limitations. Macheca notified Philadelphia of the pipe rupture/ammonia leak and made a claim for coverage. Philadelphia hired an engineer to investigate the claim. Based upon the engineer's report, Philadelphia denied Macheca's claim. Although the initial denial letter set forth what Philadelphia referred to as "pertinent sections" of the policy, the letter did not give a specific reason for the denial, stating only, "[w]e regret to advise that a Covered Cause of Loss has

not occurred, as defined in the contract, as outlined in the investigative details stated above."

After receiving the denial letter, Macheca hired attorney John Horvath. In April 2003, Horvath wrote to Philadelphia asking for the engineer's report. Philadelphia did not respond. Horvath then faxed a letter to Philadelphia requesting a copy of the engineer's report. Three weeks later, when Philadelphia still had not responded, Horvath phoned the company requesting a copy of the engineer's report for a third time. According to Macheca, Philadelphia refused to provide a copy of the engineer's report, and demanded Macheca put its coverage position in writing.

On June 10, 2003, Horvath put Macheca's coverage position in writing and requested prompt reconsideration of Philadelphia's denial. After explaining how the pipe rupture occurred, the letter pointed out a loss was a "Covered Cause of Loss" unless specifically excluded. The letter noted the policy contained two categories of exclusions – some of which applied irrespective of whether a covered event contributed to the loss, and others of which were rendered inapplicable if a covered event contributed to the loss. Macheca claimed coverage under two policy provisions. The first was an exception to the exclusions for "specified causes of loss," which included "weight of snow, ice or sleet." Macheca also claimed the loss was covered under the additional coverage Macheca purchased for "collapse."

Philadelphia did not respond to the coverage position letter. Horvath again contacted Philadelphia by phone on June 30, and was informed the matter had been referred to outside counsel for a coverage opinion. On August 15, 2003, after two additional letters and a phone call, Philadelphia sent Macheca a letter reiterating its earlier denial. This letter referred to a limitation on coverage for loss to the "interior of any building or to personal property in buildings caused by or resulting from . . . ice," taking the position the limitation referred to the artificial ice generated in the process of cooling a cold storage facility. Philadelphia also contended, however, the

weight of ice referenced in the specified causes of loss was not intended to cover artificial ice generated in the process of cooling a cold storage facility. The letter also referred to exclusion 3.c.4 for "Maintenance." In September 2003, one more round of correspondence took place between Horvath and Philadelphia in which Horvath accused Philadelphia of bad faith in its handling of Macheca's claim, and Philadelphia defended its denial. Horvath again requested the engineer's report. Philadelphia finally provided the engineer's report in a letter dated October 2, 2003.

On December 23, 2003, Macheca filed suit against Philadelphia in the Circuit Court of the City of St. Louis. The complaint alleged breach of the insurance contract, and vexatious refusal to pay. The vexatious refusal to pay claim outlined the correspondence that took place between Philadelphia and Horvath between April 2003 and October 2003. In stating the factual basis for the claim, Macheca alleged in part, "[t]he ammonia pipe collapsed as a result of the weight of ice on the pipe coupled with the hidden decay of oakum which held the hangers, supporting the ammonia pipes, in place." Appellant's App. at 15.

Philadelphia removed the case to federal court. In federal court, Macheca filed a motion for partial summary judgment on the coverage issue. Macheca relied upon the same two theories of coverage it had in the letter sent to Philadelphia on June 10, 2003, namely: (1) the specified cause of loss for weight of ice; and (2) the additional coverage for collapse. Philadelphia filed a cross-motion for summary judgment contending the loss was not covered. Philadelphia also filed a motion to disqualify Horvath as Macheca's counsel under Rule 4-3.7 of the Missouri Supreme Court Rules of Professional Conduct.[1] Philadelphia contended Horvath would be a necessary

_____

[1]Rule 4-3.7(a) provides:

A lawyer shall not act as advocate at a trial in which the lawyer is likely
to be a necessary witness unless:

witness for Macheca's vexatious refusal to pay claim, arguing the parties disagreed upon the matters discussed during the phone calls between Horvath and Philadelphia during Horvath's attempts to obtain the engineer's report and to get Philadelphia to explain the bases for its denial.

The district court granted the motion to disqualify Horvath as Macheca's counsel, concluding Horvath was likely to be a necessary witness because his communications with Philadelphia were relevant to determining whether Philadelphia's refusal to pay was willful and without reasonable cause. The district court also granted Philadelphia's motion for summary judgment, and denied Macheca's motion for partial summary judgment. In doing so, the district court only addressed one of Macheca's two arguments in support of coverage – the contention the loss was covered under the additional coverage for collapse. The district court failed to address Macheca's claim the loss was covered under the exception to certain exclusions for the specified cause of loss for weight of ice. With respect to the collapse issue, the district court determined Missouri law, as interpreted by the Missouri appellate courts, only recognized a "collapse" when there was an entire "falling or reduction [of a structure] to a flattened form or rubble." The district court concluded the refrigeration pipes had not collapsed under this definition and therefore the loss was not covered. Macheca filed a motion for reconsideration of the district court's order, noting the court failed to address Macheca's primary argument for coverage, that is, the argument the loss was caused by weight of ice. The district court denied the motion for reconsideration without comment.

---

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

Macheca appealed both the district court's order granting Philadelphia's motion for summary judgment and the order granting the motion to disqualify Horvath as Macheca's counsel. Macheca argued the district court incorrectly applied Missouri law with respect to the collapse issue, suggesting the Missouri Supreme Court would follow the modern trend which recognizes a collapse when there is substantial impairment to the structural integrity of a building or a part of a building. Macheca also contended the district court failed to address its weight-of-ice claim. Finally, Macheca contended the district court erred in disqualifying Horvath as plaintiff's counsel.

On appeal, we reversed. Macheca I, 463 F.3d at 834. We remanded the case because the district court failed to address the weight-of-ice claim advanced by Macheca. Id. at 832. We further held the district court abused its discretion when it disqualified attorney Horvath without first determining whether he would be the *only* witness who could testify to events surrounding the alleged vexatious refusal to pay claim. Id. at 833-34. In addition, we declined to address the ruling on collapse coverage, indicating Macheca was free to ask the district court to reconsider its holding on remand. Id. at 832 n.2.

After the case was remanded, Macheca brought a motion for summary judgment on two bases. First, Macheca again argued the loss was caused by the weight of ice and covered as a specified cause of loss under the policy. Second, Macheca renewed its claim the loss was covered under the policy's additional coverage for collapse. Philadelphia also brought a motion for partial summary judgment. It asked the district court for summary judgment on the collapse claim and the vexatious refusal to pay claim. In addition, Philadelphia renewed its motion to disqualify attorney Horvath as Macheca's counsel.

The district court granted summary judgment in favor of Philadelphia on both the collapse issue and the vexatious refusal to pay claim. In addition, because the

-6-

vexatious refusal to pay claim had been dismissed, the district court denied as moot the motion to disqualify Horvath. With respect to Macheca's motion for summary judgment on its weight-of-ice claim, the district court denied summary judgment. The district court determined the weight of ice was not a specified cause of loss because the policy unambiguously referred to ice as an element of the weather, rather than ice that formed on pipes as a part of the refrigeration process. In addition, the district court found there was a genuine factual dispute as to whether any of the policy's exclusions were triggered, concluding the parties disputed the cause of loss and whether there was one or more proximate cause of the loss. Macheca brought a motion to reconsider the denial of its motion for partial summary judgment on the grounds the weight of ice had been previously admitted by Philadelphia as the cause of loss. The district court denied the motion to reconsider.

The remaining issues – the proximate cause of loss and the applicability of any policy exclusions – proceeded to trial before a jury. Macheca presented evidence the loss was caused by the weight of ice on the refrigeration coils. Philadelphia presented evidence the loss was caused either by the failure to maintain the pipes which resulted in the accumulation of ice, or by a discharge of a pollutant (the ammonia), both of which Philadelphia claimed would trigger policy exclusions. The jury found in Philadelphia's favor. Macheca brought a motion for a new trial, which was denied.

Macheca then filed a timely appeal, raising nine issues: (1) the district court erred in ruling that the fall of the ruptured ammonia pipe was not a collapse; (2) the district court erred in ruling the weight of ice was not a specified cause of loss; (3) the district court erred in denying Macheca's motion for reconsideration of its motion for partial summary judgment on the issue of liability on its weight-of-ice claim; (4) the district court erred in admitting the testimony of one of Philadelphia's experts; (5) the district court erred in giving certain jury instructions; (6) the district court erred in granting summary judgment on Macheca's claim for vexatious refusal to pay; (7) the district court erred in declining to deny Philadelphia's motion to disqualify attorney

Horvath on the basis of the claim's legal insufficiency; (8) the district court erred in making certain evidentiary rulings at trial; and (9) the district court erred in denying Macheca's motion for a new trial.

II

A

Macheca first contends the district court erred in granting Philadelphia's motion for summary judgment on Macheca's claim for coverage under the "collapse" provisions of the policy. We review the grant of summary judgment de novo. Dayton Dev. Co. v. Gilman Fin. Servs., Inc., 419 F.3d 852, 855 (8th Cir. 2005). We also review de novo the district court's interpretation of the insurance policy. Am. Simmental Ass'n v. Coregis Ins. Co., 282 F.3d 582, 586 (8th Cir. 2002).

The policy's "collapse" provisions generally provided coverage for "'loss' caused by or resulting from risks of direct physical 'loss' involving collapse of 'buildings' or any part of 'buildings.'" Appellant's App. at 148.[2] The policy broadly defined "buildings" as any "buildings or structures," id. at 150, and contained an exhaustive list of items which were included within the meaning of "buildings." The list included permanently installed fixtures, permanently installed machinery, permanently installed equipment, outdoor fixtures including awnings, fire extinguishing equipment, appliances, alarm systems, communication systems, monitoring systems, underground pipes, fences, retaining walls, and patios, to name a few. Id. at 118-19. The policy did not further define a "fixture," and Philadelphia does not claim the ammonia pipes in the refrigerated warehouse were not permanently installed fixtures within the meaning of the policy. Cf. Stockton v. Tester, 273

---

[2]The policy further provided losses caused by a collapse were covered if they resulted "only" from one or more of five specific causes, one of which was a collapse caused by a "specified cause[] of loss." Id.

S.W.2d 783, 787 (Mo. Ct. App. 1954) (discussing the permanent or removable nature of a fixture and holding "if the article is so placed as to make *the building itself* peculiarly adapted and more usable for the type of business, then it is not removable"). Thus, the fight is not about whether the ammonia pipes were included within the terms "buildings or any part of buildings;" rather, the fighting issue is whether there was a "collapse" of the pipes. The policy did not define the word "collapse." We must therefore give the term "the meaning that would be reasonably understood by the average lay person . . . unless it plainly appears that [a] technical meaning [was] intended." Peters v. Emp'rs Mut. Cas. Co., 853 S.W.2d 300, 303 (Mo. 1993).

The district court held Missouri courts interpret the term "collapse" narrowly by requiring a structure or building to completely fall or be reduced to a "flattened form or rubble" before coverage is triggered under the "collapse" provisions of an insurance policy. Because the Missouri Supreme Court has not addressed the issue of the meaning of "collapse" when the term is undefined in an insurance policy, the district court relied on decisions from the Missouri Court of Appeals. See Williams v. State Farm Fire & Cas. Co., 514 S.W.2d 856, 859 (Mo. Ct. App. 1974) (indicating the term "collapse" is "not ambiguous and should therefore be given its plain and commonly understood meaning, namely, a falling or reduction to a flattened form or rubble") (citing Eaglestein v. Pac. Nat'l Fire Ins. Co., 377 S.W.2d 540, 544 (Mo. Ct. App. 1964)); see also Heintz v. U.S. Fid. & Guar. Co., 730 S.W.2d 268, 269 (Mo. Ct. App. 1987) ("There must have been a falling down or collapsing of a part of a building. A condition of impending collapse is insufficient.").

Macheca cites cases from a number of jurisdictions which have held the undefined term "collapse" is ambiguous. Those cases have interpreted the term in favor of insureds to cover any serious impairment of a building's structural integrity. This approach is clearly the majority approach under the current trend of the law. See, e.g., Schray v. Fireman's Fund Ins. Co., 402 F. Supp. 2d 1212, 1218 (D. Or. 2005) ("I conclude that the Oregon Supreme Court would also follow the modern trend and

apply the collapse coverage if any part of the building sustained substantial impairment to its structural integrity."); 401 Fourth St., Inc. v. Investors Ins. Grp., 879 A.2d 166, 174 (Pa. 2005) (interpreting identical policy language to find coverage for a parapet wall that was bowed and leaning inward but had not yet collapsed); Weiner v. Selective Way Ins. Co., 793 A.2d 434, 443 (Del. Super. Ct. 2002) ("[S]uch a policy must be taken to cover any serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the building as a structure or the health and safety of occupants and passers-by.") (citations omitted); Rankin ex rel. Rankin v. Generali-U.S. Branch, 986 S.W.2d 237, 238 (Tenn. Ct. App. 1998) ("Thus, 'the clear modern trend is to hold that collapse coverage provisions . . . which define collapse as not including cracking and settling – provide coverage if there is substantial impairment of the structural integrity of the building or any part of a building.'") (quoting Am. Concept Ins. Co. v. Jones, 935 F. Supp. 1220, 1226 (D. Utah 1996)); see also Ercolani v. Excelsior Ins. Co., 830 F.2d 31, 34 (3d Cir. 1987); Ocean Winds Council of Co-Owners, Inc. v. Auto-Owner Ins. Co., 565 S.E.2d 306, 308 (S.C. 2002); Island Breakers v. Highlands Underwriters Ins. Co., 665 So.2d 1084, 1085-86 (Fla. Dist. Ct. App. 1995) (Cope, J., concurring); Thomasson v. Grain Dealers Mut. Ins. Co., 405 S.E.2d 808, 810 (N.C. Ct. App. 1991); Beach v. Middlesex Mut. Assurance Co., 532 A.2d 1297, 1300 (Conn. 1987); Nationwide Mut. Fire Ins. Co. v. Tomlin, 352 S.E.2d 612, 614-15 (Ga. Ct. App. 1986); United Nuclear Corp. v. Allendale Mut. Ins. Co., 709 P.2d 649, 652 (N.M. 1985); Gov't Emps. Ins. Co. v. DeJames, 261 A.2d 747, 751 (Md. 1970).

The fact that several jurisdictions have reached divergent conclusions about the meaning of the term "collapse" is evidence of the term's ambiguity under Missouri law. See Harrison v. Tomes, 956 S.W.2d 268, 270 (Mo. 1997) (concluding the terms "operator" or "operating" were ambiguous in part because of the divergent conclusions about their meaning reached by several jurisdictions). As a result, we have less confidence than the district court that the Missouri Supreme Court would follow the same approach as the Missouri Court of Appeals' decisions. See Weaver v. State

Farm Mut. Auto. Ins. Co., 936 S.W.2d 818, 819-20 (Mo. 1997) (adopting the "modern trend" followed by "the majority of cases" in an insurance coverage dispute); see also Swope v. Siegel-Robert, Inc., 243 F.3d 486, 497 (8th Cir. 2001) (concluding "the Missouri Supreme Court would follow the compelling logic of the current trend" on a particular issue notwithstanding a Missouri Court of Appeals' decision to the contrary).

In the end, however, we need not predict what the Missouri Supreme Court would decide about the ambiguity of "collapse" in the abstract. Our task is limited to determining whether the term "collapse" was ambiguous as used in *this particular policy*. Under Missouri law, the terms of a policy are "ambiguous when there is uncertainty in the meaning of words used in the contract, or when the contract terms are reasonably subject to different interpretations." Am. Home Assurance Co. v. Pope, 591 F.3d 992, 999 (8th Cir. 2010) (citing Krombach v. Mayflower Ins. Co., 827 S.W.2d 208, 210 (Mo. 1992)). "Language is ambiguous if it is reasonably open to different constructions and the language used will be viewed in the meaning that would ordinarily be understood by the layman who bought and paid for the policy." Krombach, 827 S.W.2d at 210 (citing Robin v. Blue Cross Hosp. Servs., Inc., 637 S.W.2d 695, 698 (Mo. 1982)). "Missouri courts 'follow a construction favorable to the insured wherever the language of a policy is susceptible of two meanings, one favorable to the insured, the other to the insurer.'" Pope, 591 F.3d at 999 (quoting Meyer Jewelry Co. v. Gen. Ins. Co. of Am., 422 S.W.2d 617, 623 (Mo. 1968)). This rule of construction is followed in part because "as the drafter of the insurance policy, the insurance company is in the better position to remove ambiguity from the contract." Krombach, 827 S.W.2d at 211. In addition, we "must give meaning to all terms and, where possible, harmonize those terms in order to accomplish the intention of the parties." Henges Mfg., LLC v. Amerisure Ins. Co., 5 S.W.3d 544, 545 (Mo. Ct. App. 1999).

In this particular policy, the "collapse" provisions of the policy extended coverage to "buildings or any part of buildings." The policy then defined the term "buildings" very expansively to cover a plethora of items, including permanent fixtures, outdoor fixtures such as awnings, fire extinguishing equipment, appliances, underground pipes, and patios. When "collapse" is used in this context, the average lay person would not understand the term to be limited to the definition adopted by the Missouri Court of Appeals. Rather, we believe the average lay person could reasonably understand the "collapse" of an awning, for example, to occur without ever envisioning the awning being flattened or reduced to rubble. Indeed, the terms "flattened" or "reduced to rubble" would rarely be descriptive of the "collapse" of many of the items covered by the policy, such as fire extinguishing equipment, appliances, alarm systems, communication systems, or monitoring systems.

In the context of this policy, defining a "collapse" as any serious impairment of a building or part of a building's structural integrity – the majority view under the current trend in the law – is clearly more consistent with what the average lay person would reasonably understand the term "collapse" to mean when viewed in conjunction with items included in this policy's definition of "buildings." We therefore conclude the district court erred in adopting the restrictive definition of "collapse" discussed by the Missouri Court of Appeals in Williams, Eaglestein, and Heintz, because none of those cases addressed the meaning of the term "collapse" when used in conjunction

with the expansive definition of the term "buildings" used in this policy.[3] As a result, the district court erred in granting Philadelphia's motion for summary judgment.

B

Macheca next contends the district court erred when it determined the weight of ice on the refrigerated pipes could not be considered a "specified cause of loss" under the terms of the policy. Whether a loss is a "specified cause of loss" under the policy is relevant to Macheca's second coverage claim because an exception to the pollutant exclusion relied upon by Philadelphia applies when loss resulting from the discharge, release or escape of a pollutant is caused by a "specified cause of loss." Appellant's App. at 145. Whether the weight of ice was a "specified cause of loss" is also relevant to Macheca's claim for "collapse" coverage because loss caused by a "specified cause of loss" is one of five types of causes of loss covered by the "collapse" provisions of the policy. Id. at 148. We review de novo the district court's interpretation of the insurance policy. American Simmental, 282 F.3d at 586.

The "specified causes of loss" are set forth in paragraph 11 of section F of the policy, which is the Definitions section. That paragraph provides:

_____

[3]We are not swayed by Philadelphia's reliance on Council Tower Ass'n v. Axis Specialty Insurance Co., 630 F.3d 725 (8th Cir. 2011), which recently addressed the meaning of "collapse" under Missouri law. Council Tower initially applied the restrictive definition of "collapse" adopted by the Missouri appellate courts only because "both parties treated the Missouri Court of Appeals decisions as controlling in their cross-motions for summary judgment, as did the district court." Id. at 728. Ultimately, however, the court applied the broader definition of "collapse" as an impairment of the structural integrity of a part of a building, and affirmed the district court on that basis. Id. at 729-30. Thus, the actual holding in Council Tower turns on the broader definition we apply here, rather than the restrictive definition used by the Missouri appellate courts. In any event, our decision turns upon the need to harmonize the term "collapse" with the expansive definition of "buildings" used in this particular policy, an issue Council Tower did not address.

-13-

**"Specified Causes of Loss"** means the following: fire, lightning, explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

Appellant's App. at 152. Three subparts of the paragraph further define or limit three of the nineteen items listed as specified causes of loss. Id. The three items further defined are sinkhole collapse, falling objects, and water damage. The disputed item here – the weight of ice – is not further limited, described, or defined by the policy. The other two specified causes of loss which have as a common element "weight" – the weight of snow and the weight of sleet – are also not further limited, described, or defined by the policy.

The district court concluded Paragraph F.11 unambiguously referred to ice as an element of the weather, and found "as a matter of law, ice accumulating as a result of the refrigeration process is not a specified cause of loss under the policy." Id. at 1478. The district court initially observed the word ice "could refer both to ice as an element of the weather, or to ice caused by forces other than the weather." Id. Ultimately, however, the district court determined "ice" was used unambiguously in this policy because it was used in "close proximity to 'sleet' and 'snow'" both of which only refer to elements of the weather. Id. Macheca contends the district court erred when it concluded the word "ice" was unambiguous as used in this policy. We agree.

To determine whether Paragraph F.11's reference to "ice" is reasonably subject to an interpretation favorable to Macheca, we start (again) from the premise that we "must give meaning to all terms [of the policy] and, where possible, harmonize those terms in order to accomplish the intention of the parties." Henges, 5 S.W.3d at 545. We begin by examining how the term "ice" was used in other parts of the policy in order to compare those policy provisions with the use of the term "ice" in Paragraph

-14-

F.11.  Cf. Williams v. N. River Ins. Co., 579 S.W.2d 410, 412 (Mo. Ct. App. 1979) (comparing a term's use in one phrase of a policy with its absence in another).

As discussed in Macheca I, the term "ice" was also used in this policy in a limitation on coverage.  463 F.3d at 832.  Section C.1.c of the policy negated coverage for loss to the interior of buildings or personal property in buildings caused by or resulting from ice.  Appellant's App. at 148.  In the limitation on coverage, "ice" appeared in a list with five other weather-related items – "rain, snow, sleet, ice, sand or dust, whether driven by wind or not."  Id.  We noted the "district court determined 'ice' as used in the coverage limitation referred only to ice as an element of the weather."  Macheca I, 463 F.3d at 831-32.  The parties do not dispute that conclusion.

In contrast, when used in Paragraph F.11, the phrase "weight of ice" does not appear in a list limited to weather-related items.  Instead, the term appears in a list of nineteen items, some of which only refer to elements of the weather or naturally occurring events (i.e., lightning, windstorm or hail, volcanic action, weight of snow, and weight of sleet) and some of which are man-made conditions (i.e., explosion, aircraft or vehicles, riot or civil commotion, vandalism, and leakage from fire extinguishing equipment).  Appellant's App. at 152.  In addition, Paragraph F.11 includes six items which could *either* be weather related or refer to a man-made condition (i.e., fire, smoke, sinkhole collapse, falling objects, weight of ice, and water damage).  Id.

As to the six items which could either be weather-related or man-made conditions, Paragraph F.11 specifically delineates between weather-related loss and man-made loss with respect to two of those six items – sinkhole collapse and water damage.  In further defining the term "sinkhole collapse," the policy expressly indicates the term only includes loss caused by naturally occurring sinkholes rather than sinkholes created by a man-made condition.  See id. ("Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the

-15-

action of water on limestone or dolomite [but] does not include . . . [s]inking or collapse of man-made underground cavities."). In further defining the term "water damage," the distinction between a man-made and weather-related condition is resolved exactly the opposite – the policy expressly states "water damage" refers to water from within a man-made item rather than water resulting from an element of the weather. See id. ("Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam.").

Significantly, the policy does not further clarify whether the other four items which could be either weather-related or man-made conditions (i.e., fire, smoke, falling objects, and the weight of ice) are limited solely to one type of condition or another. As a result, loss resulting from weather-related fire or smoke (such as that caused by a forest fire) is arguably a specified cause of loss under the policy, but so is loss resulting from a man-made fire or smoke (such as that caused by an electrical short). Similarly, the loss caused by a meteorite (a naturally occurring event) is arguably a specified cause of loss under the term "falling objects," but the loss caused by a large object dropped on the building by a construction crane (a man-made event) would also be a specified cause of loss.

Philadelphia urges us to look only to the sublist of three items in which the term "ice" appears (i.e., "weight of snow, ice or sleet"). The insurer contends the fact that weight of snow and weight of sleet are both solely weather-related events resolves any alleged ambiguity with respect to the term "ice." We disagree. It is equally reasonable to conclude the three items of the sublist are grouped together because of the common element which triggers coverage under the policy, i.e., a loss caused by the "weight" of the items. The grouping of the three items does not necessarily lead to the conclusion the three items were grouped together to limit coverage to naturally-occurring elements of the weather, particularly in light of the mixture of the three types of terms used by the policy to define specified causes of loss: (1) those which

-16-

could only refer to naturally-occurring conditions, (2) those which could only refer to man-made conditions; and (3) those which could refer to either man-made or naturally-occurring conditions.

When considering Paragraph F.11 in its entirety, we conclude its use of the term "ice" is reasonably subject to two different interpretations, one which refers to ice exclusively as an element of the weather, and another which refers to ice in either its natural condition or as a man-made occurrence. Philadelphia chose to further define two of the six items listed in Paragraph F.11 to indicate specifically whether those items referred to weather-related or man-made conditions, but did not do so with respect to four other items, including the "weight of ice." The absence of any limitation on some items which could be both weather-related or man-made, coupled with the policy's specific clarification of other like items, strongly suggests an intent to include within the specified causes of loss both forms of the four items which could occur either naturally or at the hand of man. At a minimum, Philadelphia's failure to indicate which form of ice was covered and which was not renders the term ambiguous, and requires us to adopt the meaning which is favorable to the insured. See Oak River Ins. Co. v. Truitt, 390 F.3d 554, 558 (8th Cir. 2004) (citing Peters, 853 S.W.2d at 302). We therefore conclude the district court erred when it determined the weight of ice on the refrigerated pipes did not constitute a specified cause of loss under the terms of the policy.

C

Our conclusion the weight of ice was a specified cause of loss makes it unnecessary to address the claims Macheca appealed with respect to alleged trial errors, because the only theory of coverage submitted to the jury was Macheca's "weight of ice" coverage claim, and Macheca was entitled to partial summary judgment on the issue of liability under that theory.

To explain why Macheca was entitled to partial summary judgment on the issue of liability under its "weight of ice" claim, we begin by summarizing the undisputed facts regarding the manner in which the pipe rupture occurred. The parties do not dispute that ammonia leaked from the pipe after the pipe collapsed, or that the leaking ammonia caused the resulting damage to the warehouse floors and walls, as well as the product stored inside the warehouse. The parties also do not dispute the ammonia leak constituted a release or escape of a pollutant within the terms of the policy.

Furthermore, and most significantly, the parties do not dispute the collapse of the refrigeration pipe – which preceded and led to the ammonia leak – was caused by the weight of ice accumulating on the pipes. As the district court noted, "[t]he parties' experts uniformly agreed that the weight of ice was a cause of the pipe falling, but they did not agree that the weight of ice was the sole cause." Appellant's App. at 1483. Both of Philadelphia's experts, Thomas Richardson and John Turner, indicated the weight of ice was a cause of the pipe falling. Richardson "opined that the weight of the piping in combination with the weight of ice buildup likely caused the attachments that suspended the supporting pipes from the ceiling to gradually fail over a period of time." Id. at 1484 n.5. Similarly, Turner "opined that the cause of loss was that the weight of ice overwhelmed the plugs, causing them to detach from the ceiling, upon which the pipe fell and leaked." Id. Indeed, Philadelphia's counsel conceded during oral argument: "It was agreed that it was the weight of this accumulated frost that overwhelmed those hangers and caused that system to fall."

"Under an all-risk insurance policy, recovery will be allowed for all fortuitous losses, unless the policy contains a specific provision expressly excluding the loss from coverage." Pakmark Corp. v. Liberty Mut. Ins. Co., 943 S.W.2d 256, 259 (Mo. Ct. App. 1997). Thus, we next look to whether there is a specific provision in this policy excluding the loss caused by the pipe rupture. As the district court explained, this policy contained three categories of exclusions. One category of exclusions (the B.1 exclusions) precluded coverage "regardless of any other cause or event that

-18-

contributes concurrently or in any sequence to the 'loss.'" Appellant's App. at 142. In contrast, the other two categories (the B.2 and B.3 exclusions) lacked such language, and, therefore, only precluded coverage if the excluded event was the *sole cause* of loss. As a consequence, if a covered cause of loss was *a cause* of loss, the B.2 and B.3 exclusions did not preclude coverage. See Pace Props., Inc. v. Am. Mfrs. Mut. Ins. Co., 918 S.W.2d 883, 886 (Mo. Ct. App. 1996) (explaining the relationship between the three relevant categories of exclusions and the concept of proximate cause).

In this policy, the pollutant exclusion was a B.2 exclusion. Specifically, the pollutant exclusion was found at B.2.j of the policy and provided the policy would not cover loss "caused by or resulting from . . . [d]ischarge, dispersal, seepage, migration, release or escape of 'pollutants.'" Appellant's App. at 145. Importantly, however, the pollutant exclusion contained an exception which stated: "But we will pay for resulting 'loss' to Covered Property when the discharge, dispersal, seepage, migration, release of escape of 'pollutants' is caused by any of the 'specified causes of loss.'" Id. Thus, if a "specified cause of loss" was *a cause* of the escape or release of a pollutant, this policy provided coverage because the pollutant exclusion was a B.2 exclusion rather than a B.1 exclusion.[4] Indeed, Philadelphia's counsel conceded during oral argument: "If there was a covered event that caused the release of pollutants, then that would be covered." It is undisputed the weight of ice accumulating on the refrigeration pipe was *a cause* of the pipe's rupture, which in turn caused the release of the ammonia. Macheca was therefore entitled to partial summary judgment on

---

[4]Similar, the maintenance exclusion was a B.3 exclusion, and likewise would not preclude coverage as long as a covered cause of loss was a cause of the pipe rupture and ammonia leak.

liability under its weight-of-ice claim because the weight of ice was a specified cause of loss.[5]

D

Finally, Macheca contends the district court erred in granting summary judgment on its vexatious refusal to pay claim. We review the grant of summary judgment de novo. Dayton, 419 F.3d at 855.

To establish a claim for vexatious refusal to pay, Macheca had to prove: (1) it had an insurance policy with the insurer; (2) the insured refused to pay; and (3) the insurer's refusal to pay was without reasonable cause or excuse. Dhyne v. State Farm Fire & Cas. Co., 188 S.W.3d 454, 457 (Mo. 2006). There is no vexatious refusal when the insurer has reasonable cause to believe and does believe there is no liability under its policy and that it has a meritorious defense. Wood v. Safeco Ins. Co. of Am., 980 S.W.2d 43, 55 (Mo. Ct. App. 1998). In addition, an insurer may insist upon a judicial determination of open questions of law or fact without being penalized. Watters v. Travel Guard Int'l, 136 S.W.3d 100, 109 (Mo. Ct. App. 2004). When no Missouri case directly addresses a coverage issue, a litigable issue exists. Hocker Oil Co. v. Barker-Phillips-Jackson, Inc., 997 S.W.2d 510, 523 (Mo. Ct. App. 1999).

---

[5]Despite our conclusion Macheca was entitled to partial summary judgment on liability on its weight-of-ice claim, we addressed the propriety of granting Philadelphia's motion for summary judgment on Macheca's separate claim for collapse because the parties did not advise us on appeal whether the scope of damages under the additional coverage for "collapse" is identical to the scope of damages covered under Macheca's weight-of-ice claim. In addition, our opinion is limited to reversing the district court's grant of summary judgment in favor of Philadelphia on the "collapse" issue because the district court erred in adopting a restrictive definition of the meaning of "collapse." We express no opinion on whether Macheca is entitled to summary judgment on its claim for coverage under the "collapse" provisions of the policy.

-20-

After a general survey of all the facts and circumstances in this case, see Russell v. Farmers & Merchants Ins. Co., 834 S.W.2d 209, 221 (Mo. Ct. App. 1992), we conclude the record shows Philadelphia reasonably believed it had a meritorious defense to insurance coverage. Philadelphia's representatives reviewed the reports of the independent adjuster and engineer who investigated the ammonia leak. Based upon their investigation and findings, Philadelphia concluded there was no coverage for the incident. In addition, at the time of each of Philadelphia's denials, Missouri law denied coverage for a "collapse" in the absence of a falling or reduction to a flattened form or rubble. Although we now conclude the more restrictive definition adopted by the Missouri Court of Appeals does not control with respect to this particular policy, the absence of a controlling decision from the Missouri Supreme Court coupled with Missouri appellate decisions favoring Philadelphia created a litigable issue which entitled Philadelphia to seek a judicial determination. Similarly, a litigable issue existed with respect to whether the weight of ice was a specified cause of loss under this policy. The district court correctly determined that Philadelphia could insist upon a judicial determination of those questions without being penalized for a vexatious refusal to pay claim. See Watters, 136 S.W.3d at 108-10; Wood, 980 S.W.2d at 55. We therefore affirm the district court's grant of summary judgment on the vexatious refusal to play claim.[6]

III

We affirm the district court's dismissal of Macheca's vexatious refusal to pay claim. We reverse the district court's grant of summary judgment in favor of Philadelphia on Macheca's claim for coverage under the "collapse" provisions of the policy. We also reverse the district court's determination that the weight of ice on the

---

[6]Because the district court correctly dismissed the vexatious refusal to pay claim, it also correctly denied as moot Philadelphia's motion to disqualify attorney Horvath, as the disqualification motion only pertained to the vexatious refusal to pay claim.

refrigeration pipes was not a "specified cause of loss" under the policy, and determine Macheca was entitled to partial summary judgment on liability on its "weight of ice" claim. Thus, we reverse the jury verdict in favor of Philadelphia and remand this case for further proceedings consistent with this opinion.

_____